FILED
2016 Sep-21  PM 12:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **MATTHEW WHITT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:15-CV-00778** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 405(g), plaintiff Matthew Whitt seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Whitt's claims for a period of disability and disability insurance benefits.  After careful review, the Court affirms the Commissioner's decision.

## I.   PROCEDURAL HISTORY

Mr. Whitt applied for a period of disability and disability insurance benefits on June 14, 2013.  (Doc. 6-6, pp. 4-10).  Mr. Whitt alleges that his disability began on August 24, 2012.  (Doc. 6-6, p. 4).  The Commissioner denied Mr. Whitt's claim on August 30, 2013.  (Doc. 6-5, pp. 2-4).  Mr. Whitt requested a hearing

before an Administrative Law Judge (i.e., an ALJ).  (Doc. 6-5, pp. 12-13).  The ALJ issued an unfavorable decision on December 12, 2014.  (Doc. 6-3, pp. 15-17).  On March 10, 2015, the Appeals Council declined Mr. Whitt's request for review (Doc. 6-3, pp. 2-5), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the ALJ's factual findings are supported by substantial evidence, then the Court "must affirm even if the evidence

preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether Mr. Whitt proved that he was disabled, the ALJ followed a five-step sequential evaluation process. The ALJ considered:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

After examining the evidence, the ALJ found that Mr. Whitt has not engaged in substantial gainful activity since August 24, 2012, the alleged onset date. (Doc.

6-3, p. 20).  The ALJ determined that Mr. Whitt suffers from the following severe impairments:  spinal cord injury secondary to gunshot wound at L1-2, right lower extremity numbness and weakness, and obesity.  (Doc. 6-3, p. 20).  The ALJ also determined that Mr. Whitt suffers from the following non-severe impairments: hypertension, gastroesophageal reflux disease, and anxiety.  (Doc. 6-3, p. 21). Based on a review of the medical evidence, the ALJ concluded that Mr. Whitt does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 6-3, p. 22).

In light of Mr. Whitt's impairments, the ALJ evaluated Mr. Whitt's residual functional capacity.  The ALJ determined that Mr. Whitt has the RFC to perform:

> light work as defined in 20 C.F.R. 404.1567(b) with the following limitations.  He cannot climb ladders, ropes or scaffolds and can occasionally reach overhead with either upper extremity.  He uses a cane for ambulation and can sit on a frequent basis.  He is limited to no more than occasional standing and walking but should be able to change from standing/walking to a seated posture as frequently as every 30 minutes.

(Doc. 6-3, p. 23).  Based on this RFC, the ALJ concluded that Mr. Whitt is not able to perform his past relevant work as a cashier/stocker, fast food worker, store laborer, machine operator, or forklift operator.  (Doc. 6-3, p. 27).  Relying on opinion testimony that a vocational expert provided in response to hypothetical questions, the ALJ found that jobs exist in the national economy that Mr. Whitt can

perform given his RFC, including cashier II and parking lot attendant.  (Doc. 6-3, pp. 27-28).  Accordingly, the ALJ determined that Mr. Whitt has not been under a disability within the meaning of the Social Security Act.  (Doc. 6-3, p. 28).

## IV.    ANALYSIS

Mr. Whitt argues that he is entitled to relief from the ALJ's decision because the ALJ failed to properly evaluate the opinion of Dr. Eric Beck, Mr. Whitt's treating physician, and because the ALJ's hypothetical question to the vocational expert did not include all of Mr. Whitt's impairments.  The Court considers these arguments in turn.

### A.    The ALJ properly considered the opinion of Mr. Whitt's treating physician.

An ALJ must give the opinion of a treating physician like Dr. Beck "substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (internal quotation marks and citation omitted).   Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* at 1240-41*; see also Crawford*, 363 F.3d at 1159.  "The ALJ must clearly articulate the reasons for giving less weight to a treating physician's opinion, and the failure to do so constitutes error."  *Gaskin*, 533 Fed. Appx. at 931.

In support of his application for disability benefits, Mr. Whitt relies on a physical capacities evaluation of Mr. Whitt that Dr. Beck completed on July 16, 2014. In that evaluation, Dr. Beck stated that Mr. Whitt suffered from back and right leg pain. (Doc. 6-21, p. 25). Dr. Beck stated that the "pain [was] aggravated by daily activities" and that Mr. Whitt's experience of pain was severe enough to frequently interfere with the attention and concentration needed to perform simple work tasks. (Doc. 6-21, pp. 25-26). Dr. Beck found that Mr. Whitt's anxiety contributed to the severity of his physical symptoms. (Doc. 6-21, p. 26). Dr. Beck opined that Mr. Whitt could sit for one hour at a time before needing to get up and could stand for 20 minutes before needing to sit down or walk around. (Doc. 6-21, p. 27). Dr. Beck concluded that Mr. Whitt could sit for a total of four hours in an 8-hour work day and that Mr. Whitt could stand or walk for less than two hours in an 8-hour work day. (Doc. 6-21, p. 27). According to Dr. Beck, Mr. Whitt requires a job that permits shifting positions at will from sitting, standing, or walking, and Mr. Whitt would need to take unscheduled breaks during an 8-hour work day. (Doc. 6-21, p. 27).

Dr. Beck found that Mr. Whitt could frequently lift over 10 pounds and occasionally lift over 20 pounds. Dr. Beck opined that Mr. Whitt could occasionally twist, stoop (bend), and climb ladders and could never crouch/squat or climb stairs. (Doc. 6-21, p. 28). Dr. Beck also opined that Mr. Whitt must use a

cane or other assistive device while standing or walking and that Mr. Whitt would miss about four days of work per month as a result of his impairments or treatment. (Doc. 6-21, p. 28-29).

Dr. Beck also completed a clinical assessment of pain form. (Doc. 6-21, p. 30). Dr. Beck explained that Mr. Whitt's pain is "present to such an extent as to be distracting to adequate performance of daily activities or work." (Doc. 6-21, p. 30). Dr. Beck also noted that physical activity would "greatly increase[] [Mr. Whitt's] pain . . . to such a degree as to cause distraction from task or total abandonment of task." (Doc. 6-21, p. 30). In addition, Dr. Beck stated that Mr. Whitt's medication would cause "significant side effects" that "may limit the effectiveness of work duties or the performance of everyday tasks." (Doc. 6-21, p. 30). According to Dr. Beck, Mr. Whitt's pain and/or prescribed medication may cause "some limitations" on Mr. Whitt's ability to return to gainful employment "but not to such a degree as to create serious problems in most instances." (Doc. 6-21, p. 31). Dr. Beck also noted that Mr. Whitt's "pain may be less intense in the future[, but] it will remain a significant element in [Mr. Whitt's] life." (Doc. 6-21, p. 31).

The ALJ afforded little weight to Dr. Beck's opinion because he found that Dr. Beck's assessment was "inconsistent with the other medical evidence of record and unsupported by his own treatment notes." (Doc. 6-3, p. 26). Substantial

evidence in the administrative record supports the weight that the ALJ assigned Dr. Beck's opinion.

According to Mr. Whitt's medical records, Dr. Jason Banks referred Mr. Whitt to Dr. Beck. Dr. Banks is a neurosurgeon. He treated Mr. Whitt after Mr. Whitt suffered a gunshot to the back while he was closing the store at which he worked. The shooting was a traumatic event: on August 24, 2012, a masked assailant approached Mr. Whitt and a co-worker, insisited that the men unlock the store so that the masked man could rob it, and then shot both Mr. Whitt and his co-worker in their backs with a large caliber weapon when the men refused to admit him to the store. (Doc. 6-8, p. 10). Dr. Banks treated Mr. Whitt at Huntsville Hospital. When Dr. Banks released Mr. Whitt from Huntsville Hospital five days after the shooting, Mr. Whitt still had a bullet fragment lodged in his lumbar spine, but he was "ambulating relatively well with the assiatnce of a rolling walker." (Doc. 6-8, p. 10). Dr. Banks determined that Mr. Whitt "would benefit from rehab," and on August 30, 2012, Mr. Whitt was discharged to a rehabilitation hospital "for further physical therapy and occupational therapy." (Doc. 6-8, p. 10).

Mr. Whitt spent just shy of three weeks at Healthsouth Rehabilitation Hospital of Gadsden. (Doc. 6-8, pp. 76-91). Mr. Whitt's September 18, 2012 discharge summary states that while receiving inpatient therapy, Mr. Whitt "improved on a daily basis. . . . He tolerated sessons well." (Doc. 6-8, p. 76). Mr.

Whitt was released "without any specific medical issues," and he had "minimal pain at [the] time of his release." (Doc. 6-8, p. 76).

Dr. Beck saw Mr. Whitt more or less on a monthly basis between October 2012 and May 2014. Dr. Beck first saw Mr. Whitt on October 10, 2012 for "continued care of paraparesis following [a] gunshot wound to the back while working." (Doc. 6-9, p. 22). Dr. Beck noted that Mr. Whitt lived alone in an apartment, could ambulate with a wheeled walker, and was independent in dressing and bathing. (Doc. 6-9, p. 22). On November 14, 2012, Mr. Whitt told Dr. Beck that he was experiencing increased pain in his right leg and back. (Doc. 6-9, p. 20). Dr. Beck increased the dosage of Mr. Whitt's medication to accommodate his back and leg pain. (Doc. 6-9, p. 20). On December 12, 2012, Mr. Whitt again complained that he was having some increased pain in his right leg. (Doc. 6-9, p. 18). Dr. Beck noted that Mr. Whitt had trouble getting to therapy. Dr. Beck adjusted Mr. Whitt's medication. (Doc. 6-9, p. 18).

Mr. Whitt returned to Dr. Beck for a check-up on January 9, 2013. Dr. Beck noted that Mr. Whitt had anxiety issues and increased leg pain, but Mr. Whitt was not "taking his Lyrica 2/day." Dr. Beck explained that Mr. Whitt's leg pain was "neuropathic in nature and not likely to respond to increased opiates." (Doc. 6-9, p. 16). Therefore, Dr. Beck encouraged Mr. Whitt to take Lyrica. (Doc. 6-9, p. 16). When Mr. Whitt's "significant other" commented that she could not see how

9

Mr. Whitt could return to work, Dr. Beck responded that "return to work in a modified setting is a very realistic goal as I have had patients paralyzed essentially from the neck down who manage 40 hour work weeks." (Doc. 6-9, p. 16). Mr. Whitt asked about counseling, an option that Dr. Beck thought was "an excellent idea." (Doc. 6-9, p. 16).

On February 13, 2013, Dr. Beck noted that Mr. Whitt complained of right leg pain and right knee weakness. Dr. Beck found no instability in Mr. Whitt's knee. (Doc. 6-9, p. 14). Dr. Beck prescribed physical therapy to strengthen Mr. Whitt's right leg. Dr. Beck remarked that Mr. Whitt "has yet to see Dr. Walker."[1] (Doc. 6-9, p. 14).

One month later on March 13, 2013, Dr. Beck noted that Mr. Whitt was "doing better since we increased the Lyrica." (Doc. 6-9, p. 12). Dr. Beck reported that Mr. Whitt had neither seen Dr. Walker nor gone to physical therapy since his previous visit. Dr. Beck opined that as part of Mr. Whitt's rehabilitation plan, Mr. Whitt needed "to formulate a schedule [to] return to work in some fashion." (Doc. 6-9, p. 12). Mr. Whitt agreed. (Doc. 6-9, p. 12).

When Mr. Whitt returned to see Dr. Beck on April 10, 2013, Dr. Beck expressed frustration with Mr. Whitt's failure to work toward prior goals. Dr. Beck reported:

---

[1] Dr. Walker is a neuropsychologist. (Doc. 6-21, p. 13).

> Patient has not returned to work in any fashion since our last [visit].
> He now can not do even minimal activity such as sweeping without
> crippling pain.  He informs me today that he does not feel he will ever
> be able to return to work as before which is a complete departure from
> our last conversation.  We have been trying to get him into see Dr.
> Walker for three months with some reason why he cannot go.  I
> basically stated that if his goals are not to participate in a
> rehabilitation program then we do not need to be expending any more
> energy here.  He then states he will be willing to try to return to work
> but he will need to see Dr. Walker first.  I think given his previous
> statements [this] is an exercise in futility.  I do not have any further
> recommendations.  He does want to continue with his medications
> although at the same time he is telling me they don't help.

(Doc. 6-9, p. 10).   During the visit, Dr. Beck observed that Mr. Whitt was

ambulating easily with a single point cane which Mr. Whitt did not use for "weight

bearing" but rather carried with him as he walked.  (Doc. 6-9, p. 10-11).

On May 8, 2013, Dr. Beck noted:

> Patient returns following 6 sessions of PT with no progress.  He had
> testing with Dr. Walker which was invalid.  She did recommend
> psychotherapy which I would certainly support.  I think we are very
> close to case closure and I discussed this with Mr. Whitt.  I would like
> him to have a follow up visit with Dr. Banks to see if he agrees with
> [maximum medical improvement] and then proceed to an impairment
> rating and work restrictions per Dr. Anderson.

(Doc. 6-9, p. 7).  During his visit with Dr. Beck on May 8, 2013, Mr. Whitt agreed

to return his wheelchair.  (Doc. 6-9, p. 8).

As of November 2013, Mr. Whitt was still "ambulating with a single point

cane."  (Doc. 6-20, p. 50).  Also in November 2013, Dr. Beck referred Mr. Whitt to

Spine & Neuro Physical Therapy for a functional capacity evaluation "to determine

11

[Mr. Whitt's] ability to perform the duties of work." (Doc. 6-20, p. 36; *see also* Doc. 6-20, p. 11). A physical therapist and certified functional capacity evaluator examined Mr. Whitt. (Doc. 6-20, pp. 12-36). The therapist concluded that "[t]he results of this evaluation suggest that Mr. Whitt gave an unreliable effort." (Doc. 6-20, p. 36). The therapist determined that Mr. Whitt's "current physical demand classification" is sedentary. (Doc. 6-20, p. 36). Based on Mr. Whitt's performance during the evaluation, Dr. Keith Anderson concluded that Mr. Whitt has a "15% impairment of the whole person regarding [his] work related injury." (Doc. 6-20, p. 10). Dr. Anderson found that Mr. Whitt could frequently sit and occasionally walk, climb stairs, and stand; however, Dr. Anderson found that the functional capacity evaluation was invalid because Mr. Whitt gave unreliable effort and refused to participate in many of the tests. (Doc. 6-20, p. 10).

On December 11, 2013, Dr. Beck wrote in Mr. Whitt's medical record that increasing Mr. Whitt's Lyrica dosage helped Mr. Whitt's pain, and Dr. Beck recommended a knee brace to treat buckling of Mr. Whitt's right knee. (Doc. 6-20, p. 5). On February 5, 2014, Dr. Beck noted that Mr. Whitt was fitted for a knee brace and had stopped taking his Lyrica prescription because he felt he was gaining weight. (Doc. 6-19, p. 60). Dr. Beck increased Mr. Whitt's hydrocodone dosage to four times a day, and Dr. Beck explained that pain medication "enables [Mr. Whitt] to perform household activities." (Doc. 6-19, p. 60).

On May 7, 2014, Dr. Beck noted that Mr. Whitt was having increased back pain.  (Doc. 6-24, p. 19).  Dr. Beck stated that Mr. Whitt's "most recent testing placed him in the light category of work."  (Doc. 6-24, p. 19).  This most recent testing took place as part of a functional capacity evaluation that occupational therapist Dave Bledsoe performed on March 25, 2014.  (Doc. 6-23, p. 2). According to Mr. Bledsoe, Mr. Whitt exhibited "very good efforts" and "attempted all requested tasks."  (Doc. 6-23, p. 2).  Based on his examination, Mr. Bledsoe determined that Mr. Whitt had a 10% whole person impairment and that Mr. Whitt could perform only light work.  (Doc. 6-23, p. 2).

During Mr. Whitt's visit with Dr. Beck on May 7, 2014, Dr. Beck found that Mr. Whitt was well-developed, well-nourished, and had an improved gait.  (Doc. 6-24, p. 20).  Mr. Whitt's left leg strength and tone were normal.  On the right side, Mr. Whitt had 4/5 hip flexion and 4+ knee extension; otherwise, he had full strength in his right leg.  (Doc. 6-24, p. 20).

None of these treatment notes suggest that Mr. Whitt was disabled to such a degree that he was unable to work.  Instead, as the ALJ found, the records indicate that Mr. Whitt preferred pain medication to the physical therapy and psychotherapy that Dr. Beck prescribed.  The ALJ determined that Dr. Beck's physical capacities evaluation was inconsistent with the conservative course of treatment that Dr. Beck provided, the two FCE evaluations that Dr. Beck ordered,

and Mr. Whitt's daily activities.  Substantial evidence supports this conclusion.

As to Mr. Whitt's treatment records, the ALJ relied on Dr. Beck's statements in a 2013 record that returning to modified work activity would be a "very realistic goal" for Mr. Whitt and that Mr. Whitt could engage in sedentary work.  (Doc. 6-3, p. 26; Doc. 6-9, pp. 12, 16).  The ALJ also rested his opinion on records from 2013 which indicate that Dr. Beck wanted Mr. Whitt to develop a plan to return to work, but Mr. Whitt seemed unwilling to participate in a rehabilitation program.  (Doc. 6-9, p. 12).  Moreover, just a few months before Dr. Beck completed the functional capacity evaluation upon which Mr. Whitt relies, Dr. Beck completed another evaluation in which he explained that Mr. Whitt displayed "very good efforts" and was capable of occasionally to frequently standing and occasionally carrying, pushing, and pulling 20 pounds.  (Doc. 6-22, p. 24; Doc. 6-23,  p. 2).[2]

With respect to Mr. Whitt's anxiety, on January 9, 2013, Dr. Beck noted that

---

[2] Mr. Whitt argues that an evaluation from Dr. Banks in 2013 supports Dr. Beck's disability evaluation.  (Doc. 16, p. 4).  On March 11, 2013, Dr. Banks opined that Mr. Whitt had reached maximum medical improvement due to a "significant irreversible nerve root injury that is not likely to return any function in his right leg better than it is now."  (Doc. 6-20, p. 64).  Dr. Banks noted severe weakness in Mr. Whitt's hip flexors, but Mr. Whitt's quadriceps and hamstrings were somewhat stronger.  (Doc. 6-20, p. 64).  In addition, "[x]-rays show good alignment without evidence of complication.  There is no obvious instability that is seen."  (Doc. 6-20, p. 64).

Dr. Banks's records do not indicate that Mr. Whitt was unable to work because of his injury.  On October 12, 2012, Dr. Banks restricted Mr. Whitt from work "until he returns in two to three months."  (Doc. 6-20, p. 72).  Dr. Banks's opinion is inconsistent with Dr. Beck's March 13, 2013 treatment record.  (Doc. 6-9, p. 12).  Just two days after Dr. Banks suggested that Mr. Whitt reached maximum medical impairment, Dr. Beck opined that Mr. Whitt should return to work.  (Doc. 6-9, p. 12).  Given the totality of the medical evidence, the ALJ did not err in giving little weight to Dr. Banks's single note.

Mr. Whitt continued to have anxiety issues and suggested switching medication. (Doc. 6-9, p. 16).[3]   Under the "Problems" section of Mr. Whitt's medical record, Dr. Beck noted "anxiety state unspecified."   (Doc. 6-9, p. 17).   Contrary to Mr. Whitt's assertion, the ALJ did not ignore this notation or Mr. Whitt's testimony regarding his anxiety.   (Doc. 12, pp. 12-13).   Rather, the ALJ determined that the medical evidence demonstrated that Mr. Whitt's anxiety was "well controlled with medication, required no more than sporadic treatment and follow-up, and [] the claimant did not have a recurring diagnosis."   (Doc. 6-3, p. 21).   Substantial evidence supports this conclusion.   *See Hutchinson v. Astrue*, 408 Fed. Appx. 324, 327 (11th Cir. 2011) (finding that the ALJ was not required to assign limitations due to anxiety as there was scant evidence to prove the anxiety existed and the evidence did not demonstrate the effect on the claimant's ability to work); *see also Wind v. Barnhart*, 133 Fed. Appx. 684, 690 (11th Cir. 2005) (noting that a diagnosis alone does not constitute a limitation and that "the claimant must show the effect of the impairment on [his] ability to work.").[4]

   With respect to course of treatment, the ALJ noted that Dr. Beck's

---

[3] When Dr. Beck "suggested switching to Buspar and tapering off the Xanax due to dependency issues with this medicine [Mr. Whitt's significant other] objected to this notion as she does not like Buspar and feels Xanax is a good drug as she has been on it for years."  (Doc. 6-9, p. 16). Dr. Beck also suggested "decreasing [Mr. Whitt's] hydrocodone for the same reasons and [Mr. Whitt's] significant other does not like this idea either."  (Doc. 6-9, p. 16).

[4] The administrative record demonstrates that although Dr. Beck and Mr. Whitt discussed counseling on more than one occasion, Mr. Whitt did not seek counseling on a regular basis.

"treatment measures have been conservative in nature, which is inconsistent with the presence of moderately severe to severe impairments and pain." (Doc. 6-3, p. 26). The ALJ explained that "Dr. Beck's own treatment notes covering the period May 2013 through September 2014 document only sporadic office visits and consist mainly of medication refill requests." (Doc. 6-3, p. 26; *see also* Doc. 6-9, pp. 7-23; Doc. 6-19, pp. 52-60; Doc. 6-20, pp. 3-8). On no occasion did Dr. Beck recommend Mr. Whitt refrain from work or limit his physical activity. On October 8, 2014, Dr. Beck discussed weight loss strategies and encouraged Mr. Whitt to boost his aerobic activity. (Doc. 6-24, p. 25). *See Harrison v. Comm'r of Soc. Sec.*, 569 Fed. Appx. 874, 877 (11th Cir. 2014) ("The conservative and routine nature of Dr. Davina–Brown's treatment plan suggests that Harrison's impairments—while significant—were not so severe that Harrison could not perform any job duties.").

Finally, with respect to daily activities, the ALJ found that Mr. Whitt's reports of his daily activities were inconsistent with the restrictions imposed by Dr. Beck. (Doc. 6-3, p. 26). On August 30, 2012, Dr. Zania Narcisse noted that Mr. Whitt lived alone and was "independent with activities of daily living." (Doc. 6-8, p. 78). On October 10, 2012, Mr. Whitt informed Dr. Beck that he was "independent with dressing and bathing" and that he lived by himself. (Doc. 6-9, p. 22). On February 5, 2014, Dr. Beck noted that Mr. Whitt had a home exercise

16

program and was able to perform household activities while on his pain medication. (Doc. 6-19, p. 60). On October 8, 2014, Dr. Beck noted that Mr. Whitt was capable of walking for ten to 15 minutes and biking. (Doc. 6-24, p. 25). Furthermore, on the day that Dr. Beck completed the physical capacities evaluation, Dr. Beck noted that Mr. Whitt was independent in his activities and self-care. (Doc. 6-24, p. 27).

The ALJ properly considered the inconsistencies in Dr. Beck's treatment notes, the conservative nature of Dr. Beck's treatment measures, and Mr. Whitt's range of daily activities, and substantial evidence supports the ALJ's decision to give Dr. Beck's opinion little weight. (Doc. 6-3, p. 26). *See Crawford*, 363 F.3d at 1159 (finding that the treating physician's opinion that the claimant was totally and permanently disabled was unsupported by the medical evidence and inconsistent with the physician's own treatment notes); *see also Roth v. Astrue*, 249 Fed. Appx. 167, 168 (11th Cir. 2007) (finding that substantial evidence supported the ALJ's determination that the treating physician's opinion "should not be assigned substantial weight because it was inconsistent with the record as a whole and not supported by the doctor's own medical records.").

## B.   The ALJ's Hypothetical Question Comprised All of Mr. Whitt's Impairments.

For the testimony of a vocational expert "to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's

impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).  An ALJ is not required to "include findings in the hypothetical that the ALJ [has] properly rejected as unsupported." *Crawford*, 363 F.3d at 1161.

Mr. Whitt argues that the hypothetical question that the ALJ posed to the vocational expert was inadequate because the hypothetical failed to account for the limitations that Dr. Beck identified.  (Doc. 12, p. 14).   As discussed above, *supra* pp. 5-17, substantial evidence supports the ALJ's decision to give little weight to Dr. Beck's proposed limitations; therefore, the ALJ was not required to include those limitations in his hypothetical to the vocational expert.  The hypothetical included all of the limitations supported by the record.  *Crawford*, 363 F.3d at 1161; *see also Ingram v. Comm'r of Soc. Sec*., 496 F.3d 1253, 1270 (11th Cir. 2007) ("The hypothetical need only include the claimant's impairments . . . not each and every symptom of the claimant.") (internal quotation marks and citation omitted).

## V.    CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's decision is supported by substantial evidence, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the ALJ.  Accordingly, the Court affirms the Commissioner.  The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 21, 2016.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE